**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISON**

| | |
|---|---|
| RANDY R. LIEBICH, | |
| Plaintiff, | |
| v. | Case No. _____ |
| ILLINOIS DEPARTMENT OF CORRECTIONS, JOHN BALDWIN, RANDY PFISTER, WALTER NICHOLSON, CHARLES BEST, TYNEER BUTLER-WINTERS, OFFICER STARKEY, VICTOR M. PEREZ, BYRON MITCHELL, JOSHUA CLEMENTS, CAYMAN WILCOX, OFFICER JOHNSON, OFFICER RIVERA, OFFICER DAVENPORT, OFFICER SHEVLIN, and ETHAN A. OLSON, | |
| Defendants. | |

## COMPLAINT

Plaintiff Randy R. Liebich, by and through counsel, complains against defendants the Illinois Department of Corrections, Acting Director John Baldwin, Warden Randy Pfister, Warden Walter Nicholson, Lieutenant Commander Charles Best, Correctional Counselor Tyneer Butler-Winters, and Internal Affairs Officers, Starkey, Victor M. Perez, Byron Mitchell, Joshua Clements, Cayman Wilcox, Johnson, Rivera, Davenport, William Shevlin, and Ethan A. Olson (together, "Defendants") as follows:

## Introduction

1.      Mr. Liebich was released from the custody of the Illinois Department of Corrections ("IDOC") in September 2017 after serving nearly eighteen years for a crime he did not commit. Since 2009, Mr. Liebich has suffered from chronic kidney stones that have led to multiple hospitalizations, and an enlarged prostate that prevents him from urinating normally. In

2011, Mr. Liebich brought a civil rights suit arising from prison personnel's failure to provide him with appropriate medical care and accommodations for his kidney condition. Among other things, the 2011 lawsuit alleged that, although the defendants knew Mr. Liebich's medical condition prevented him from providing a urine sample in a short timeframe, they repeatedly subjected him to a drug testing protocol that required him to do so. Defendants then punished Mr. Liebich severely when he was unable to comply. In January 2017, Mr. Liebich entered into a settlement agreement with the defendants in that lawsuit.

2.      Immediately following the settlement, however, IDOC employees resumed subjecting Mr. Liebich to arbitrary drug testing that required him to provide urine samples in a two-hour timeframe, and again responded with draconian punishment when his medical condition prevented him from complying. Mr. Liebich brings this federal civil rights and Illinois tort action to redress the physical and emotional harm Defendants inflicted on him with their unconstitutional and unlawful acts.

**Jurisdiction and Venue**

3.      This court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Mr. Liebich brings this action under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 (the "ADA"), and the Rehabilitation Act, 29 U.S.C. § 974, to remedy violations of his civil rights.

4.      This court has supplemental jurisdiction over Mr. Liebich's Illinois tort claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

**Parties**

6.      Mr. Liebich was, at all relevant times, a prisoner of the IDOC incarcerated at

2

Stateville Correctional Center located at 16830 South Broadway Street in Joliet, Illinois ("Stateville"). In September 2018, Mr. Liebich's conviction was vacated and he was released from prison. He now resides in Chicago, Illinois.

7.     Defendant IDOC is a government agency responsible for all Illinois state prisons, including Stateville.

8.     Defendant John Baldwin is the Acting Director of the IDOC, responsible for the overall operation of the IDOC. Defendant Baldwin is being sued in his official capacity only.

9.     Defendant Randy Pfister is an IDOC employee and the former warden of Stateville. At all relevant times, Warden Pfister was acting under color of law. Warden Pfister is being sued in his individual capacity.

10.     Defendant Walter Nicholson is an IDOC employee and the current warden of Stateville. At all relevant times, Warden Nicholson was acting under color of law. Warden Nicholson is being sued in his individual capacity.

11.     Defendant Charles Best is an IDOC employee who, at all relevant times was a lieutenant commander at Stateville and chair of the Adjustment Committee acting under color of law. Best is being sued in his individual capacity.

12.     Defendant Tyneer Butler-Winters is an IDOC employee who, at all relevant times, was a correctional counselor at Stateville and member of the Adjustment Committee acting under color of law.

13.     Defendants Starkey, Victor M. Perez, Byron Mitchell, Joshua Clements, Cayman Wilcox, Johnson, Rivera, Davenport, Shevlin, and Ethan A. Olson are IDOC employees who, at all relevant times, were working as correctional officers in the Internal Affairs unit at Stateville acting under color of law. These defendants are being sued in their individual capacities.

3

## Facts

### A.  Mr. Liebich's History of Kidney Distress at Stateville

14.     In September 2009, while Mr. Liebich was incarcerated at Stateville, he began to experience constant and severe pain in his abdomen and kidneys. In October 2009, Mr. Liebich sought medical attention.

15.     Wexford Health Sources, Inc. ("Wexford") is a private company that contracts with the State of Illinois to provide medical care to prisoners in IDOC custody, including men housed at Stateville.

16.     In November and December 2009, medical professionals employed by Wexford saw Mr. Liebich in the Health Care Unit at Stateville.

17.     Though they refused to refer Mr. Liebich to an outside hospital for treatment, the doctors ordered lab work on two occasions. The results from both labs revealed signs of kidney distress, including elevated blood urea nitrogen and creatinine levels.

18.     Through the end of 2009 and into the spring of 2010, Mr. Liebich continued to experience kidney pain. He also began to pass kidney stones while urinating. During this time, Mr. Liebich sought medical care by submitting written requests to the prison's health care providers and by sending written grievance forms to non-medical staff—including Stateville's warden—describing his condition and pleading for medical attention.

19.     On June 25, 2010, Mr. Liebich found himself completely unable to urinate. More than twenty-four hours later, Mr. Liebich was sent to the prison's Health Care Unit where a doctor diagnosed him with an impacted urinary calculus, meaning a large kidney stone was lodged in his urethra preventing urine from passing through.

20.     Rather than refer Mr. Liebich to an outside hospital for emergency treatment, Dr.

Saleh Obaisi—a Wexford employee—attempted to remove the stone by inserting tweezers into Mr. Liebich's urethra. The procedure was unsuccessful and stretched open Mr. Liebich's urethra, causing it to tear and bleed.

21.     Hours passed while Mr. Liebich languished bleeding and in pain. In the late afternoon, Mr. Liebich was finally transported to Provena Saint Joseph Medical Center. There, a urologist surgically removed the stone while Mr. Liebich was under general anesthesia.

22.     Following his surgery, Mr. Liebich submitted at least three grievances complaining that he was not receiving medical care for his kidney condition. In addition, Mr. Liebich described his symptoms and need for care during multiple visits to the Health Care Unit. Lab work ordered by prison medical staff in the summer and fall of 2010 again came back abnormal, indicating kidney distress.

23.     On September 25, 2010, Mr. Liebich again found himself unable to urinate. Defendant Clements, who was working as a correctional officer in the cell house where Mr. Liebich resided, escorted Mr. Liebich to the Health Care Unit. Mr. Liebich was admitted to the infirmary for three days. During his hospitalization, medical professionals inserted a catheter into Mr. Liebich's bladder to drain the urine because Mr. Liebich could not urinate naturally.

**B.  Mr. Liebich's History of Drug Testing at Stateville**

24.     Over the years Mr. Liebich was incarcerated at Stateville, he was subjected to sporadic drug tests by officers from the Internal Affairs unit ("IA"). On information and belief, IA is responsible for investigating administrative and criminal matters regarding staff and inmates at IDOC prisons. When administering a drug test, an IA officer or officers typically escort a prisoner to a holding cell in the Investigations Unit at the prison. There, the IA officer provides the prisoner a plastic specimen cup, and permits the prisoner two hours to urinate into

5

the cup. Once the prisoner has done so, the IA officer closes the cup using a lid with an attached dipstick. The dipstick indicates the presence of drugs in the sample. On occasion, an IA officer will provide a specimen cup to a prisoner in his cell, rather than escorting the prisoner to the Investigations Unit.

25.     In the seventeen years Mr. Liebich was incarcerated, he submitted to dozens of drug tests. He never failed a drug test and was never found in possession of any illegal substances.

26.     On January 5, 2011, an IA officer escorted Mr. Liebich from his cell to the Investigations Unit, and informed Mr. Liebich he would have two hours to provide a urine sample for drug testing. Mr. Liebich explained that he suffered from a kidney condition that affected his ability to urinate, and he may need additional time to produce a urine sample.

27.     Mr. Liebich was unable to produce the urine sample within two hours.

28.     On January 6, 2011, Mr. Liebich received a disciplinary report for his failure to provide the sample.

29.     Mr. Liebich was entitled to a hearing on the disciplinary report before an administrative body at the prison known as the Adjustment Committee.

30.     On information and belief, pursuant to IDOC policy, when a disciplinary report is referred to the Adjustment Committee, the prisoner named in the report is entitled to a hearing before two committee members, during which he is given the opportunity to address the Committee and present documentary evidence and witnesses in his defense. After reviewing the evidence, the Committee will determine the prisoner's guilt and, if it finds him guilty, impose a punishment.

31.     Mr. Liebich's hearing took place on January 13, 2011. Mr. Liebich was not

permitted to present any documentary evidence or witnesses. He nevertheless explained his medical condition and referred the Committee members to medical staff, correctional staff, and medical records that could corroborate his account.

32.     On January 19, 2011, Mr. Liebich received the Adjustment Committee's final report, which found him guilty of violating the drug testing policy. The report reasoned that Mr. Liebich "could not produce proof of the medical condition he claimed he had" as his "medical record has nothing about Liebich having a urinating problem."

33.     The Adjustment Committee sentenced Mr. Liebich to six months of segregation and other restrictions, and revoked six months of his good time credit.

34.     On January 26, 2011, Mr. Liebich filed a grievance challenging the Adjustment Committee's finding and attaching medical records that documented his difficulty and, on occasion, inability to urinate.

35.     The grievance officer who reviewed Mr. Liebich's submission recommended that the disciplinary report be expunged. The warden, however, rejected that recommendation and permitted Mr. Liebich to remain in segregation for the entire six-month sentence.

36.     During Mr. Liebich's time in segregation, he continued to seek treatment for his kidney stones. In March 2011, for example, a CAT scan showed that Mr. Liebich had developed another stone in one of his kidneys.

37.     On May 9, 2011, Mr. Liebich underwent surgery at an outside hospital to permit a urologist to examine his urethra and bladder. The urologist diagnosed Mr. Liebich with a swollen prostate and prescribed Flomax to treat the condition and help him urinate.

38.     Until October 2014, Mr. Liebich received Flomax, and his kidney symptoms remained controlled.

39.    In the fall of 2014, a new doctor arrived at the prison. On October 16, 2014, she discontinued Mr. Liebich's Flomax prescription. Mr. Liebich submitted a grievance alerting the prison to his need for the medication, but his prescription was not reinstated.

40.    Thereafter, Mr. Liebich again began developing kidney stones and experiencing difficulty urinating.

41.    Between 2011 and 2015, Mr. Liebich was sent to the urology department at UIC on at least four occasions for treatment of his kidney condition.

**C.  Mr. Liebich's 2011 Lawsuit and 2017 Settlement.**

42.    On August 17, 2011, Mr. Liebich sued Stateville's warden, a correctional officer, Wexford, and several Wexford employees for violating his rights under federal and Illinois law by failing to provide appropriate medical care, and for failing to accommodate his disability in administering drug tests. Mr. Liebich's Third Amended Complaint named additional IDOC employees as defendants. *See Liebich v. Hardy*, No. 11-cv-05624 (N.D. Ill.), ECF No. 123.

43.    After almost six years of litigation, the parties settled Mr. Liebich's claims. He filed a stipulation to dismiss the lawsuit on January 3, 2017.

**D.  Defendants Repeat the Previous Misconduct, Depriving Mr. Liebich of Accommodations for His Disability and Punishing Him for Being Disabled**

44.    On or around December 22, 2017, less than a year after the settlement, an IA officer appeared at Mr. Liebich's cell to escort Mr. Liebich to the Investigations Office for another drug test. Mr. Liebich was able to provide a urine sample that tested negative for drugs.

45.    Defendants Mitchell, Perez, and Wilcox were IA officers at Stateville in January 2018. At the same time, on information and belief, Defendant Clements was chair of IA at Stateville and Defendant Starkey was chair of the Investigations and Intelligence Division.

8

46.     On January 11, 2018, Defendants Mitchell and Perez escorted Mr. Liebich from his cell to the Investigations Office for yet another drug test.

47.     Defendants Clements, Wilcox, and Starkey were in the Investigations Office when Mr. Liebich arrived with Defendants Mitchell and Perez.

48.     Mr. Liebich told the officers that he suffered from a kidney condition that sometimes made it impossible for him to provide a urine sample in only two hours. He explained that he had passed a kidney stone the day before and was having difficulty urinating.

49.     Defendant Starkey told Mr. Liebich that if he could not provide a sample in two hours, Starkey would ensure that Mr. Liebich received the maximum punishment of six months segregation time, and that Mr. Liebich would be transferred to Pontiac Correctional Center, a prison notorious for holding prisoners in solitary confinement under harsh conditions.

50.     While Mr. Liebich was waiting in the holding cell, Defendant Wilcox approached him and, in the hearing of the other IA officers, asked how much money Mr. Liebich got from his recent settlement. Mr. Liebich did not respond.

51.     After two hours, Mr. Liebich was only able to produce a small amount of urine. Defendant Mitchell looked at the sample, told Mr. Liebich it wasn't enough, and threw it away without attempting to test it.

52.     Mr. Liebich pleaded with Defendant Clements—who had escorted Mr. Liebich to the infirmary for his hospitalization in 2010—to acknowledge that Clements knew about Mr. Liebich's kidney disorder. Mr. Liebich also offered to submit to a blood test to show that he was not under the influence of drugs.

53.     Defendant Clements stood by while Defendant Mitchell handcuffed Mr. Liebich. Mr. Liebich was then escorted from the Investigations Office to the segregation housing unit.

54. Later that day, Defendant Perez submitted a disciplinary report citing Mr. Liebich for a "Drugs & Drug Paraphernalia" offense. In the comments field on the disciplinary report form, Perez wrote: "refused to provide a urine sample."

55. Mr. Liebich received a copy of the disciplinary report and notification that he would be brought before the Adjustment Committee for a hearing.

56. Before the hearing, Mr. Liebich spoke to Defendant Johnson, a correctional officer working as an hearing investigator for the Adjustment Committee. Mr. Liebich requested Johnson's help gathering medical records and past grievances, which documented his history of kidney disorder and difficulty urinating.

57. In addition, Mr. Liebich asked correctional officer P. Jones, who had escorted him to St. Joseph Medical Center in June 2010, to provide a statement for his defense. Jones agreed, and, on information and belief, provided a statement to Defendant Johnson.

58. The Adjustment Committee hearing took place January 23, 2018 before Defendants Lieutenant Commander Best and correctional counselor Tyneer N. Butler-Winters.

59. Mr. Liebich had been unable to procure copies of the vast majority of his medical records or grievances before the hearing; and to his surprise, the Committee did not have a copy of Officer Jones' witness statement. Nor did Defendant Johnson take any action to gather Mr. Liebich's medical records or disciplinary records for the Committee's consideration.

60. At the hearing, Mr. Liebich explained his medical condition to Defendants Best and Butler-Winters, and described where they could find documents in his prison medical and master file corroborating his account. He also provided the names of medical and correctional staff who witnessed his condition over the years.

61. The Committee found Mr. Liebich guilty and sentenced him to three months in

segregation; three months of C Grade status (meaning he would only be permitted to place one phone call per month); three months of commissary restriction (meaning he would only be permitted to purchase hygiene products); and six months without any contact visits.

62.     The Adjustment Committee's report summarizing the hearing noted: "Per HCU staff there's nothing in Liebich R34930 file stating he has a problem urinating or producing a specimen. Liebich haven't [sic] had a problem since 2010. The Committee is satisfied that inmate Liebich R34940 did in fact violate the charges cited."

63.     On information and belief, the Committee did not, in fact, confer with medical staff about Mr. Liebich's continuing urological issues and the effect of those issues on his ability to urinate. Alternatively, the Committee took no steps to corroborate the incorrect information medical staff provided, including reviewing Mr. Liebich's medical records and/or permitting Mr. Liebich to present witnesses to attest to his post-2010 problems urinating.

64.     The following day, on January 24, 2018, Mr. Liebich was seen by physician assistant La Tanya Williams in the Health Care Unit.

65.     Williams noted in Mr. Liebich's medical record, among other things, that he had a history of nephrolithiasis—a disease characterized by chronic kidney stones—and benign prostatic hyperplasia—prostate gland enlargement that can block the flow of urine out of the bladder. She ordered blood tests; renewed Mr. Liebich's Flomax prescription; referred him to the medical director for a follow-up appointment; and requested Wexford approve Mr. Liebich for an ultrasound of his kidney and bladder.

66.     Mr. Liebich's lab results were returned two days later. The labs were again abnormal, indicating kidney distress. Among other things, the labs showed Mr. Liebich's urine contained a "large" amount of blood.

11

67.     On January 29, 2018, Wexford approved Williams' ultrasound recommendation based on its finding that Mr. Liebich had a history "of kidney stones over the past 10 years. Last seen by Urology in 2015. Reporting pain in renal area. Passed two small stones in 6 weeks."

68.     The ultrasound was conducted the same day and, according to the report, showed multiple kidney stones up to .4 cm in Mr. Liebich's right kidney and stones up to .9 cm in his left kidney. In the field for "impressions," the ultrasound report noted: "Nonobstructing bilateral nephrolithiasis," meaning Mr. Liebich had stones in both kidneys.

69.     On February 1, 2018, Warden Pfister or his delegate signed the Adjustment Committee's final summary report indicating his approval.

70.     On February 6, 2018, Mr. Liebich wrote substantially identical letters to Defendant Best and Defendant Nicholson, who had recently taken over for Pfister as warden of Stateville. The letters reported that the Adjustment Committee sentenced him to segregation based on its finding that he hasn't had kidney issues since 2010. In his letter to Defendant Best, Mr. Liebich explained:

> This is incorrect and I ask that you contact the HCU and have them verify these specific dates from my medical file that confirm[] that I've had multiple issues with kidney stones, BPH (Benign Prostatic Hyperplasia), urine retention, inability to urinate, and Nephrolithiasis (3-20-2017, 7-1-2015, 8-12-2014, 7-2-2014, 5-8-2014, 2-6-2014, 10-30-2014, 5-1-2013 prescription order, 12-12-12 prescription order, 9-25-12, 7-11-14, 6-10-14, 1-13-14, 9-20-13, 6-18-11, 5-4-2011, 8-17-12, 2-16-12 prescription order, 2-16-12, 5-9-11). These are just some of the records that establish my issues exceed far beyond 2010.

71.     Mr. Liebich enclosed with both letters copies of the medical records from his January 2018 Health Care Unit visit, lab work, and ultrasound. He elaborated: "this is mitigating evidence that must be considered because it substantiates and confirms that I have a current medical condition that prevented me from being able to produce an adequate urine specimen on 1-11-2018."

72.     On February 15, 2018, Mr. Liebich spoke to hearing investigator Johnson to inquire about Officer Jones' witness statement. Johnson acknowledged that she took a statement from Jones in advance of the hearing. Mr. Liebich requested a copy of the statement. Five days later, Johnson told Mr. Liebich that according to Defendant Best, Johnson could not provide Mr. Liebich a copy of Jones' witness statement. On March 2, Johnson admitted to Mr. Liebich that she typed Jones' statement into the computer, but due to a technical error, the Adjustment Committee never received it. Johnson said that Defendant Best would not allow her to add the statement to Mr. Liebich's record at that time.

73.     Between January and April 2018, Mr. Liebich submitted at least five grievances alerting IDOC employees at Stateville that he (a) suffered from a disability; (b) IA was refusing to accommodate the disability; (c) he received a disciplinary report because of his disability; (d) he was denied the chance to present a fair defense at his Adjustment Committee hearing; and (e) the Adjustment Committee's decision to severely punish him was based on demonstrably false information.

74.     For example, on January 14, 2018, Mr. Liebich grieved that IA's drug testing protocol and Mr. Liebich's punishment for failing to provide a urine sample in two hours violated the ADA.

75.     On January 16, 2018, Mr. Liebich grieved that, earlier that day, IA Officer Mitchell subjected him to *another* drug test using the same protocol (though this time, Mr. Liebich was able to provide a large enough sample, which was negative for drugs).

76.     In a January 26, 2018 grievance, Mr. Liebich reported that Defendant Johnson ignored his request for help gathering evidence for his Adjustment Committee hearing.

77.     On February 8, 2018, Mr. Liebich filed a grievance describing his January

13

medical visit and test results, and attached copies of the medical records.

78.     Finally, on March 6, 2018, Mr. Liebich submitted a grievance attaching excerpts from the expert report of urologist Richard James Boxer, M.D., which he'd disclosed in his 2011 lawsuit. The expert report detailed Mr. Liebich's history of kidney stones; the standard of treatment for Mr. Liebich's condition; and Dr. Boxer's conclusion that IDOC's policies caused Mr. Liebich to receive below-standard medical care.

79.     On information and belief, Defendant Nicholson concurred with the decision to deny each of those grievances.

80.     Despite receiving Mr. Liebich's grievances, letters, and medical records, Defendants Nicholson and Best failed to take any steps to help Mr. Liebich.

81.     As a result, solely because of his medical disability, Mr. Liebich served three months in segregation with drastic limitations on his privileges and no access to the law library or educational and religious programming. In addition, for six months, Mr. Liebich was restricted from placing more than one phone call per month and from receiving contact visits.

**E.  Defendants Retaliate Against Mr. Liebich**

82.     IDOC employees at Stateville responded to Mr. Liebich's grievances with a series of punitive and retaliatory strip searches and cell shakedowns.

83.     On February 12, 2018 a tactical team ambushed Mr. Liebich in his cell, strip searched him, and ransacked his belongings. The team found no contraband.

84.     March 21, 2018, Defendant Olson, a correctional officer assigned to IA, searched Mr. Liebich's cell and his property and legal boxes, which were being stored in the property room of the segregation housing unit.

85.     Defendant Olson claimed to find contraband in the property box and wrote a

disciplinary report citing Mr. Liebich for a "Major Infraction."

86.     Olson indisputably fabricated the contraband he claimed to have found. Indeed, a sergeant at Stateville assigned to the segregation unit inventoried the Mr. Liebich's property box in January 2018 when Mr. Liebich was sentenced to segregation. The sergeant documented that Mr. Liebich had no contraband. Between then and Defendant Olson's search, Mr. Liebich did not have access to the box. The sergeant appeared before the Adjustment Committee at the hearing on Olson's disciplinary report and explained as much.

87.     Consequently, the Adjustment Committee—which included Defendant Best—expunged the report, noting: "Staff verifies that none of the items were in [Mr. Liebich's] box when he was brought to seg and he hasn't had access to his property."

88.     Warden Nicholson signed off on the expungement on March 28, 2018.

89.     On March 23, 2018, IA officers Mitchell and Perez removed Mr. Liebich from his cell, strip searched him, and ransacked his belongings. The officers found no contraband and the search served no purpose other than to harass Mr. Liebich.

90.     IA officers Wilcox, Rivera, Davenport, and Shevlin returned to Mr. Liebich's cell six days later and subjected him to another punitive strip search and cell shakedown. Again, the officers found no contraband.

91.     Mr. Liebich filed emergency grievances alerting Warden Nicholson of the retaliatory and abusive shakedowns and strip searches. Warden Nicholson denied both grievances.

92.     In addition, while Mr. Liebich was returning from a medical appointment in early 2018, he passed Warden Nicholson in the prison hallway. Mr. Liebich told the warden that IA was harassing him, and Nicholson responded: "I know all about you."

15

93.     Warden Nicholson took no steps thereafter to stop IA officers' retaliation against Mr. Liebich.

## Count I
## Violations of the ADA
## (Against Baldwin and IDOC)

94.     Mr. Liebich re-alleges and incorporates the preceding paragraphs of this pleading as if fully alleged herein.

95.     On July 12, 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

96.     The IDOC is a public entity because it is a department, agency, special purpose district, or other instrumentality of the State of Illinois, as defined in 42 U.S.C. § 12131(1).

97.     Mr. Liebich, at all times relevant to this complaint, was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2), and had a right not to be subjected to discrimination on the basis of his disability. 42 U.S.C. § 12132.

98.     Under the ADA, 42 U.S.C. § 12132, and 28 C.F.R. § 35.130(a), Defendants must ensure that individuals in their custody are not, on the basis of a disability, excluded from participation in or denied the benefits of generally available services, programs, or activities.

99.     Defendants subjected Mr. Liebich to repeated random drug testing that required him to provide an on-demand urine sample knowing of his kidney condition, and knowing that he likely could not comply with the testing protocol.

100.     Individuals in IDOC custody, like Mr. Liebich, are wholly dependent on the IDOC for medical care, accommodation, and safety.

101.     Defendants failed to accommodate Mr. Liebich's disability by, among other things, refusing to lift the time restriction on the IA drug testing protocol, and subjecting him to punishment for his inability to provide a urine sample within two hours. That punishment included, among other things, depriving Mr. Liebich of the privileges and opportunities afforded to other inmates at Stateville, including access to the law library, educational programming, religious programming, phone calls, contact visits, and unrestricted commissary purchases.

102.     As a result of Defendants' wrongful conduct, Mr. Liebich was subjected to unnecessary pain and suffering.

<u>**Count II**</u>
**Violation of the Rehabilitation Act**
**(Against Baldwin and IDOC)**

103.     Mr. Liebich re-alleges and incorporates the preceding paragraphs of this pleading as if fully alleged herein.

104.     The purpose of the Rehabilitation Act is to ensure that no "qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

105.     IDOC receives federal financial assistance within the meaning of 29 U.S.C. § 794(a).

106.     IDOC constitutes a "program or activity" within the meaning of 29 U.S.C. § 794(b)(1)(A)-(B) and/or (b)(2)(B), and is required to comply with the Rehabilitation Act.

107.     Mr. Liebich is a qualified individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(2). He has a right not to be excluded, on the basis of his

disability, from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

108.    Defendants excluded Mr. Liebich from participation in, denied him the benefits of, and subjected him to discrimination under various programs and activities receiving federal financial assistance by, among other things, refusing to permit Mr. Liebich more than two hours to provide a urine specimen for drug testing, and denying Mr. Liebich access to various services and facilities at Stateville, including the law library, commissary, telephone, contact visits, and educational and religious programming.

109.    As a result of Defendants' wrongful conduct, Mr. Liebich was subjected to unnecessary pain and suffering.

### Count III
**42 U.S.C. § 1983 – Cruel & Unusual Punishment (Eighth Amendment)**
**(Against Perez, Mitchell, Baldwin, and Pfister)**

110.    Mr. Liebich re-alleges and incorporates the preceding paragraphs of this pleading as if fully alleged herein.

111.    As described above, Defendants Perez and Mitchell inflicted unnecessary physical and emotional pain and suffering on Mr. Liebich by refusing to permit him extra time to provide a urine sample. They did so intentionally, wantonly, with malice and/or with reckless indifference to Mr. Liebich's rights.

112.    Alternatively, Defendants knew the risk of harm that their misconduct posed and nevertheless acted with deliberate indifference in carrying out the drug test.

113.    As a result of Defendants' unjustified and unconstitutional conduct, Mr. Liebich suffered pain, emotional distress, and injuries.

114.    Mr. Liebich's injuries were proximately caused by the policies and practices of

18

John Baldwin and Randy Pfister.

115.    On information and belief, Defendants Perez and Mitchell executed their unconstitutional drug test pursuant to a policy or practice implemented and overseen by Defendants Baldwin and Pfister. Accordingly, Defendants Baldwin and Pfister, who were responsible for supervision and oversight of the IA officers at Stateville, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training to and supervision of IA officers, and failed to adequately punish and discipline prior instances of similar misconduct. Defendants Baldwin and Pfister thus violated Mr. Liebich's rights by maintaining and implementing policies and practices that were the moving force behind the foregoing constitutional violation.

116.    On information and belief, Defendants Baldwin and Pfister had notice of policies and practices pursuant to which IA subjected disabled prisoners to unconstitutional and tortious drug testing protocols, as described above. Despite knowledge of these problematic policies and practices, Defendants Baldwin and Pfister did nothing to ensure disabled prisoners were provided extra time to provide urine samples for drug testing, and were not punished for their failure to provide samples in two hours. The above-described policies and practices were able to exist and thrive because Defendants Baldwin and Pfister were deliberately indifferent to the problem, thereby effectively ratifying it.

117.    Mr. Liebich's injuries were caused by IDOC employees, including the named defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described in this count.

**Count IV**
**42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)**
**(Against Nicholson, Starkey, Mitchell, and Clements)**

118.     Mr. Liebich re-alleges and incorporates the preceding paragraphs of this pleading as if fully alleged herein.

119.     As described above, Defendants Nicholson, Starkey, Mitchell, and Clements had a reasonable opportunity to prevent the violation of Mr. Liebich's constitutional rights set forth above had they been so inclined; but they failed to do so.

120.     Defendants' actions were undertaken intentionally, with malice and with reckless indifference to Mr. Liebich's rights.

121.     As a direct and proximate result of the misconduct described in this count, Mr. Liebich's rights were violated and he suffered physical and emotional injuries.

**Count V**
**42 U.S.C. § 1983 – Procedural Due Process (Fourteenth Amendment)**
**(Against Nicholson, Johnson, Best, and Butler-Winters)**

122.     Mr. Liebich re-alleges and incorporates the preceding paragraphs of this pleading as if fully alleged herein.

123.     As described more fully above, Defendants Nicholson, Johnson, Best, and Butler-Winters violated Mr. Liebich's right to procedural due process by depriving Mr. Liebich of the right to call witnesses and/or present documentary evidence at his Adjustment Committee hearing, and by recommending and/or approving, among other punishments, three months of segregation and six months of C-grade status when there was no evidence to support a guilty verdict, and when Defendants knew that in fact Mr. Liebich's medical condition had caused his inability to provide a urine sample.

124.     Defendants' actions were undertaken intentionally, with malice and with reckless indifference to Mr. Liebich's rights.

125.     As a direct and proximate result of the misconduct described in this count, Mr. Liebich's rights were violated and he suffered physical and emotional injuries.

**Count VI**
**42 U.S.C. § 1983 – Retaliation for Speech (First Amendment)**
**(Against Perez, Mitchell, Wilcox, Rivera, Davenport, Shevlin, Olson, and Nicholson)**

126.     Mr. Liebich re-alleges and incorporates the preceding paragraphs of this pleading as if fully alleged herein.

127.     On information and belief, Defendants Perez, Mitchell, Wilcox, Rivera, Davenport, Shevlin, and Olson were aware of Mr. Liebich's requests for accommodation of his disability, his 2011 lawsuit against IDOC, Wexford, and their employees, and the grievances Mr. Liebich submitted about his mistreatment at Stateville.

128.     Mr. Liebich's right to request accommodations and treatment for his physical disability, submit grievances, and file lawsuits is protected by the Free Speech Clause of the First Amendment to the United States Constitution.

129.     As described above, Defendants Perez, Mitchell, Wilcox, Rivera, Davenport, Shevlin, and Olson took adverse, hostile, and unreasonably harmful action against Mr. Liebich, including subjecting him to punitive strip searches and shaking down his cell in retaliation for Mr. Liebich's exercise of his constitutional rights.

130.     As described above, Defendant Nicholson took adverse, hostile, and unreasonably harmful action against Mr. Liebich, including condoning Mr. Liebich's continued incarceration in segregation because of his physical inability to produce a urine specimen in two hours.

131.     Mr. Liebich's exercise of his right to free speech, including his complaints, lawsuit, and grievances, was the motivating factor for Defendants' adverse acts against him.

21

## Count VII
### Willful and Wanton Misconduct under Illinois Law
**(Against Pfister, Nicholson, Johnson, Best, Butler-Winters, Starkey, Perez, Mitchell, Clements, Wilcox, Rivera, Davenport, Shevlin, and Olson)**

132.    Mr. Liebich re-alleges and incorporates the preceding paragraphs of this pleading as if fully alleged herein.

133.    Because Mr. Liebich was a prisoner in their care, Defendants had a duty to refrain from deliberately or intentionally harming Mr. Liebich, or acting in a manner that showed utter indifference to or conscious disregard for Mr. Liebich's safety.

134.    By denying Mr. Liebich the opportunity to present evidence at his disciplinary hearing, punishing Mr. Liebich with segregation, and retaliating against him, Defendants were willful and wanton in that they demonstrated an utter indifference Mr. Liebich's safety.

135.    Defendants were aware that an injury would likely result from their course of action and recklessly disregarded the consequences of those actions.

136.    As a direct and proximate result of Defendants' willful and wanton misconduct, Mr. Liebich suffered physical and emotional injuries.

## Count VIII
### Intentional Infliction of Emotional Distress under Illinois Law
**(Against Pfister, Nicholson, Johnson, Best, Butler-Winters, Starkey, Perez, Mitchell, Clements, Wilcox, Rivera, Davenport, Shevlin, and Olson)**

137.    Mr. Liebich re-alleges and incorporates the preceding paragraphs of this pleading as if fully alleged herein.

138.    As described above, by denying Mr. Liebich the opportunity to present evidence at his disciplinary hearing, sentencing him to segregation, and retaliating against him, Defendants engaged in extreme and outrageous conduct.

139.    Defendants' actions set forth above were rooted in an abuse of power or authority.

140.    Defendants' actions set forth above were undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress or with reckless disregard of that probability.

141.    Defendants' actions set forth above were undertaken with malice, willfulness, and reckless indifference to Mr. Liebich's rights.

142.    As a direct and proximate result of this misconduct, Mr. Liebich suffered injuries, including severe emotional distress and great conscious pain and suffering.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Randy R. Liebich demands judgment against each defendant and against Defendants, jointly and severally, awarding him:

1.    Compensatory damages for emotional distress, pain and suffering, and actual and direct losses and expenses Mr. Liebich has incurred and will incur as a result of Defendants' individual and collective actions, the exact amount to be proven at trial, together with prejudgment interest and costs;

2.    An award of punitive damages against each defendant except Defendants Baldwin and IDOC to punish his individual and collective wrongful conduct and to deter future wrongful conduct;

3.    Mr. Liebich's costs and disbursements arising from this action, including reasonable attorneys' fees, costs and expenses, pursuant to 42 U.S.C. § 1988; and

4.    Such further relief as the Court deems just and proper.

## Jury Demand

Mr. Liebich hereby requests trial by jury on all claims so triable.

23

Dated: January 10, 2019    Respectfully Submitted,

           RANDY LIEBICH

           By: *s/ Alison R. Leff*
             One of His Attorneys

           Jon Loevy
           Arthur Loevy
           Alison R. Leff
           LOEVY & LOEVY
           311 N. Aberdeen St., 3rd Floor
           Chicago, IL 60607
           (312) 243-5900 (phone)
           jon@loevy.com
           arthur@loevy.com
           alison@loevy.com